UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GREG LOPEZ,

    Plaintiff,

v.                                      CASE NO. 3:16-cv-980-J-34MCR

ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

    Defendant.
_____/

## **REPORT AND RECOMMENDATION**[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his application for a period of disability and disability insurance benefits. Plaintiff alleges he became disabled on April 24, 2011.[2] (Tr. 183-87.) A hearing was held before the assigned Administrative Law Judge ("ALJ") on September 16, 2014, at which Plaintiff was represented by an attorney. (Tr. 48-71.) The ALJ found that Plaintiff was disabled, but only for a limited period of

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; M.D. Fla. R. 6.02.

[2] Plaintiff had to establish disability on or before December 31, 2016, his date last insured, in order to be entitled to a period of disability and disability insurance benefits. (Tr. 21.)

time. (Tr. 28.) The ALJ found that, as of November 20, 2012, Plaintiff was no longer disabled because he could perform a significant number of jobs in the national economy. (Tr.28-37.)

Plaintiff is appealing the Commissioner's decision that he was not disabled after November 19, 2012. Plaintiff argues that the ALJ erred in determining that medical improvement occurred so as to terminate disability benefits. Plaintiff has exhausted his available administrative remedies and the case is properly before the Court. The undersigned has reviewed the record, the briefs, and the applicable law. For the reasons stated herein, the undersigned respectfully **RECOMMENDS** that the Commissioner's decision be **AFFIRMED**.

**I.     Standard of Review**

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence

preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II. Background

### A. Relevant Medical Evidence

On April 24, 2011, Plaintiff was injured at his prior job as a maintenance supervisor at an apartment complex. (Tr. 53-54, 441.) On that date, Plaintiff was on an emergency maintenance call when glass shattered from an apartment unit above him. (*Id.*) Plaintiff initially landed on his left shoulder and subsequently fell again, slipping on glass shards. (*Id.*)

Plaintiff was initially diagnosed with left ulnar neuritis and left lateral epicondylitis, based on a May 17, 2011 MRI of the left elbow. (Tr. 307, 311.) Plaintiff presented to Dr. Gary Dunlap on July 14, 2011. (Tr. 485-86.) Dr. Dunlap provided the following description of Plaintiff's medical history during the disability period:

> By the time I saw him in July 2011, which was three months after his injury, he was really showing some neurogenic signs. Initially, we thought it might be an ulnar nerve at the elbow, but

3

> that was not even clear. Electromyographies (EMGs) that were taken by Dr. [Eugenio] Alcazaren even clouded the picture even [sic] further because there was some [sic] additional median nerve issues. The patient was also describing some sensation in the other arm that was similar to what he has experienced in the left arm. Then, further working up and found [sic] that he had x-rays demonstrating some spondylosis and degenerative disk changes at C5-6 which are obviously old and preexisting. The problem is that the patient has not had any neurologic symptoms prior to that. The x-ray changes were several years old, and he has obviously been working quite capably beforehand. So at that point, I recognized that this was an aggravation of a preexisting problem. While the x-ray changes were probably 60% at least of what is going on before [sic]. The magnetic resonance imaging (MRI) demonstrated that he had significant herniated disk with stenosis contributing to bilateral nerve root impingement. That was new. That was the aggravation of the preexisting problem. I believe that this injury when we combine his history with his physical findings, and all his laboratory data, and radiographic studies show that he probably reinjured his neck, to such an extent that he has some neurogenic findings that are substantially worsening. He's got definite cardinal sign on the left side, the Spurling's sign in his neck, and he is having weakness developed along with sensory loss in his right arm. I believe that this would not have occurred if his injury at work not happened [sic]. My hope that [sic] this information will help resolved [sic] his problem and get him into [sic] spine experts to have his neck taken care of, which I think will resolve all of his problems.

(Tr. 479.) The MRI cited by Dr. Dunlap above, which showed significant herniated disc at the C5-6 level with bilateral nerve root impingement, was performed on September 16, 2011. (Tr. 403-04.) Subsequently, Plaintiff elected to undergo disc decompression and cervical fusion surgery at the C5-6 level and such procedure was performed successfully on March 26, 2012. (Tr. 418-19.)

4

On August 31, 2012, Plaintiff saw Dr. Alcanzaren for a consultation at Dr. Dunlap's request. (Tr. 448-50.) Dr. Alcanzaren found that Plaintiff had "[s]omewhat diminished bilateral grip strength, left worse than right," and "[p]atchy, decreased sensation, especially down [Plaintiff's] left arm." (Tr. 448.)

On November 13, 2012, Plaintiff presented to Michael King, M.D. for neck pain. (Tr. 491-94.) Dr. King found Plaintiff to be in no acute distress. (Tr. 493.) Upon examination, Plaintiff's cervical spine was non-tender to palpation, but he had "some" tenderness in the trapezius regions bilaterally. (*Id.*) Plaintiff had "moderate" restriction of range of motion of the neck. (*Id.*) He had a normal cranial nerve exam and an unremarkable cerebellar exam. (*Id.*) Plaintiff's motor strength was normal (5/5), except for 4+/5 wrist flexor strength bilaterally. (*Id.*) His sensation was "preserved," but he had "some" distorted or unpleasant sensations to touch in the left C6 and 7 distributions. (*Id.*) Plaintiff had a normal gait and station. (*Id.*)

Plaintiff underwent an MRI of the cervical spine on November 20, 2012. (Tr. 743-44.) The MRI revealed no fracture, subluxation, or specific evidence of an acute injury; non-specific mild reversal of the cervical lordosis commonly attributed to pain or positioning; and status post C5-6 anterior cervical discectomy and fusion. (Tr. 744.) The MRI also revealed degenerative findings causing central spinal stenosis that was "border line at every level from C3-4 and C6-7, but greatest at C5-6," and associated ventral cord flattening at C3-4 and C6-7

5

that was minimal and at C4-5 and C5-6 that was mild, although there was no associated cord signal abnormality. (*Id.*) Additionally, the MRI revealed neural foraminal narrowing that was "most significant at C5-6, where the degree [was] mild to moderate bilaterally." (*Id.*)

After surgery, Plaintiff continued treatment with Coastal Orthopedics & Sports Medicine ("Coastal"). Plaintiff complained of lumbar pain on April 12, 2013. (Tr. 620-22.) An examination revealed tenderness and decreased range of motion, but indicated "[n]egative facet maneuvers, [n]egative Lhermitte's exam, [and] [n]egative Spurling exam." (Tr. 622.) Similar findings were noted at a May 10, 2013 visit to Coastal. (Tr. 804.) Plaintiff subsequently received epidural steroid injections. (Tr. 753-58, 808-13.) Plaintiff returned to Coastal on October 2, 2013, complaining of neck pain. (Tr. 678-82.) His examination revealed restricted range of motion in the neck, but normal upper extremity strength. (Tr. 681.) It was noted at that time that Plaintiff may need an extension of fusion at the C6-7 level for axial symptoms. (*Id.*)

Plaintiff underwent a CT scan of his cervical spine on October 22, 2013. (Tr. 685-86.) The scan revealed spondylosis at the C5-6 and C6-7 levels with mild to moderate bilateral C6 and C7 foraminal stenoses, chronic in appearance. (Tr. 685.) The scan indicated "[n]o evidence for a focal nuclear herniation, chronic in appearance," as well as "[p]ostsurgical changes as defined with no complicating features identified, chronic in appearance." (*Id.*)

6

Plaintiff returned to Coastal on October 25, 2013 for complaints of neck pain. (Tr. 687-91.) The examination revealed some abnormal cervical findings, but also revealed normal upper extremity strength, including normal strength of the bilateral wrist flexors. (Tr. 690.) Plaintiff visited Coastal on November 6, 2013. The examination revealed normal cervical findings, except for some decreased sensation in the arm and mild Tinel's sign in the left wrist. (Tr. 764.) The examination again revealed normal upper extremity strength. (*Id.*)

Plaintiff returned to Dr. King on November 19, 2013, complaining of worsening neck symptoms. (Tr. 746-47.) Dr. King noted that Plaintiff was in mild distress. (Tr. 746.) Dr. King reported that strength was difficult to assess secondary to pain, but that he did not detect any definite focal weakness. (*Id.*) Dr. King reported that while Plaintiff's symptoms "are quite severe, the pathology that can be demonstrated on his MRI is quite mild." (*Id.*) Dr. King did not recommend any additional surgical intervention as additional surgery would not significantly improve Plaintiff's symptoms. (*Id.*)

On December 4, 2013, Plaintiff visited Coastal for a follow-up appointment and medication refill. (Tr. 766-68.) The cervical findings and upper extremity strength were again normal with a reduced range of motion. (Tr. 767.)

Plaintiff underwent a cervical myelogram on January 31, 2014. (Tr. 749.) The post-myelogram CT scan of the cervical spine demonstrated that the prior operation site appeared unremarkable. (Tr. 750.) The scan also demonstrated

7

"[m]ild cervical spondylosis without evidence of disk herniation or stenosis," and "straightening of normal lordotic curvature." (*Id.*) On February 5, 2014, Dr. King noted that the January 31, 2014 scan did not reveal any additional pathology than was present on his prior MRI. (Tr. 752.) Dr. King also noted that he did not see any areas of significant spinal or foraminal stenosis. (*Id.*) Finally, Dr. King observed very minor epidural defects, but nothing amendable to additional surgical intervention. (*Id.*)

Plaintiff returned to Coastal on February 14, 2014 for a follow-up appointment and medication refill. (Tr. 769-72.) The cervical findings, Plaintiff's upper extremity strength, and Plaintiff's gait were normal upon examination, but Plaintiff showed some tenderness, radicular pain, and reduced range of motion in the neck. (Tr. 771.) Similar findings were noted in a February 27, 2014 office visit at Coastal. (Tr. 775.)

On February 25, 2014, Plaintiff underwent vocational dexterity aptitude testing. (Tr. 704-05.) The vocational rehabilitation consultant noted Plaintiff's inability to continue tests due to his poor performance on the first two tests and increase in pain, and opined that Plaintiff could not perform work. (*Id.*)

On May 1, 2014, Plaintiff's pain management doctor, Gennady Gekht, M.D., testified in a deposition and opined as to certain restrictions he placed on Plaintiff as a result of Plaintiff's radicular pain. (Tr. 821-65.) Dr. Gekht found "[s]ome of [Plaintiff's] complaints [of pain] certainly consistent with the diagnostic

8

studies," but also testified that he "ha[s]n't been able to notice much objective findings except for diminished reflexes which were diminished symmetrically." (Tr. 838.)

**B. The ALJ's Decision**

The ALJ found that Plaintiff had a cervical spine disorder accompanied by nerve root compression which met the criteria listed in 20 C.F.R. pt. 404, subpt P, App. 1, § 104(A), but only for a limited and specific time period – April 24, 2011 to November 19, 2012.[3] (Tr. 25-28.) As of November 20, 2012, the ALJ found that medical improvement occurred, which resulted in Plaintiff no longer having nerve root compression, or either of the other aggravating factors listed in § 1.04(A). As a result, the ALJ found that after November 19, 2012, Plaintiff's impairments no longer met or equaled a listed impairment. (Tr. 28.) Further, after that date, the ALJ found that Plaintiff's statements concerning the intensity and limiting effects of his symptoms were not entirely credible. (Tr. 29-33.) The ALJ also discounted the opinions of Plaintiff's treating doctors, including Dr. Gekht, to the extent that they restricted Plaintiff to sedentary work, lifting no greater than 10 pounds and

---

[3] Listing 1.04(A) requires a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

sitting only 45 to 60-minute intervals before needing to stand, walk, or lie down. (Tr. 35.) In doing so, the ALJ stated that the opinions are inconsistent with the record evidence and that the doctors relied heavily on Plaintiff's subjective complaints while uncritically accepting as true most, if not all, of Plaintiff's reports. (*Id.*) Therefore, the ALJ held that Plaintiff ceased being disabled as of November 20, 2012. (Tr. 37.)

### III. Discussion

Plaintiff raises one general issue on appeal. He argues that the ALJ's determination that Plaintiff showed medical improvement is not supported by substantial evidence and is contradicted by the objective medical evidence of record. The undersigned disagrees and finds that substantial evidence supports the ALJ's decision that medical improvement occurred.

Since Plaintiff was found by the ALJ to be disabled from April 24, 2011 through November 19, 2012, the only issue on appeal is whether his disability ended on the latter date. The regulations set out an eight-step inquiry to answer that question, paraphrased as follows:

> (1) Is the claimant engaged in substantial gainful activity? If so, the disability has ended.
>
> (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment? If so, the disability will be found to continue.
>
> (3) If not, has there been a medical improvement? If so, go to

10

step (4). If not, go to step (5).

(4) Is the medical improvement related to the claimant's ability to do work; *i.e.*, has there been an increase in the claimant's residual functional capacity ("RFC")? If not, go to step (5). If so, go to step (6).

(5) If at step (3) there has been no medical improvement, or if at step (4) medical improvement is not related to ability to do work, do any exceptions apply? If so, then the Commissioner looks to step (6). If an exception from the second group applies, then the disability has ended.

(6) Are the claimant's current impairments severe in combination? If not, the disability has ended.

(7) If so, can the claimant (based on his or her RFC) perform his or her past relevant work? If so, the disability ends.

(8) If not, can the claimant do other work given his or her RFC, age, education, and work experience? If so, the disability ends.

*See* 20 C.F.R. § 404.1594(f).

The eight-step inquiry focuses on whether the claimant has experienced "medical improvement" since he or she was last found to be disabled. *See, e.g., Johnson v. Comm'r of Soc. Sec.*, 618 F. App'x 544, 547 (11th Cir. 2015) ("In considering a claimant's continuing disability, the ALJ must determine whether there has been any medical improvement in the claimant's impairments since the claimant was first adjudged disabled and, if so, whether the medical improvement is related to the claimant's ability to work.") (citing 20 C.F.R. § 404.1594(a)). The regulations define medical improvement as "any decrease in the medical severity

of [the claimant's] impairment(s)."  20 C.F.R. § 404.1594(b)(1).  A determination that medical improvement has occurred may be based on changes in the claimant's symptoms or laboratory findings associated with the alleged impairment.  *Id.*

Plaintiff argues that the ALJ erred in finding medical improvement because the record medical evidence shows that "there is no substantial change in Plaintiff's medical condition."  (Doc. 17 at 18.)  Plaintiff correctly notes, however, that the "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits to determine whether *any* decrease in the medical severity of Plaintiff's impairments occurred.  20 C.F.R. § 404.1594(b)(1), (7); *see also* (Doc. 17 at 18 (recognizing that "medical improvement" is defined by "any decrease in the medical severity" of an impairment, which is based on "changes in the symptoms, sign and/or laboratory findings" associated with the impairment and noting that the Commissioner is required to compare the prior and current medical evidence to make such determination) (internal quotations omitted).)

Here, the ALJ identified and discussed the portion of the record prior to November 19, 2012 that showed the evidence of "nerve root compression."  (Tr. 26.)  The ALJ likewise identified and discussed the relevant medical evidence showing that Plaintiff met the other requirements of Listing 1.04(A).  In contrast,

12

the ALJ discussed the relevant, post-November 19, 2012 medical records and found no evidence of nerve root compromise.  The ALJ also identified and discussed other indications of Plaintiff's medical improvement.  The ALJ's comparison is supported by substantial evidence.

For example, the September 16, 2011 MRI indicated a significant herniated disc at the C5-C6 level resulting in bilateral nerve root impingement.  (Tr. 403-04, 479.)  Plaintiff subsequently underwent decompression of the nerve roots at the C5-6 level in March 2012 (Tr. 418-19) and a November 20, 2012 MRI, while noting some abnormalities, did not indicate any nerve root impingement or nerve root compression (Tr. 744 (revealing no fracture, subluxation, or specific evidence of an acute injury; non-specific mild reversal of the cervical lordosis commonly attributed to pain or positioning; and status post C5-6 anterior cervical discectomy and fusion)).  The absence of nerve root compromise represents a decrease in the medical severity of Plaintiff's impairment based on laboratory findings associated with Plaintiff's impairments.  Subsequent records also did not indicate nerve root compromise or impingement as shown on Plaintiff's September 16, 2011 MRI.  (*See, e.g.,* Tr. 685 (October 22, 2013 CT scan indicating "[n]o evidence for a focal nuclear herniation, chronic in appearance," as well as "[p]ostsurgical changes as defined with no complicating features identified, chronic in appearance"), Tr. 746 (November 19, 2013 report from Dr. King indicating that while Plaintiff's symptoms "are quite severe, the pathology that can

13

be demonstrated on his MRI is quite mild"), 752 (report from Dr. King noting that the January 31, 2014 post-myelogram CT scan did not reveal any additional pathology than was present on his prior MRI, noting that he did not see any areas of significant spinal or foraminal stenosis, observing very minor epidural defects, and prescribing conservative care).)

Substantial evidence also supports the ALJ's decision that Plaintiff no longer met the other requirements of Listing 1.04(A). As discussed by the ALJ, Plaintiff exhibited decreased sensation and muscle loss in his upper extremities during the disability period. (Tr. 432 (noting decrease in sensation in ulnar hand, and weakness in wrist extension and grip strength), 435 (noting decreased sensation in arms and diminished bilateral grip strength), 459 (noting diminished sensation in left hand and weakness in wrist extension and grip strength), 479 (reporting that Plaintiff has "a definite cardinal sign on the left side, the Spurling's sign in his neck, and he is having weakness developed along with sensory loss in his right arm").) However, medical records during the current period demonstrate that although Plaintiff continued to exhibit some distorted or unpleasant sensations, his overall feeling and muscle strength improved. (Tr. 493 (indicating "preserved sensation" with "some dysesthesia in the left C6 and 7 distributions," and "[m]otor strength is 5/5 except for 4+/5 wrist flexor strength bilaterally"), 622 (indicating "[n]egative facet maneuvers, [n]egative Lhermitte's exam, [and] [n]egative Spurling exam"), 625 (same), 681, 690, 764, 767, 771, 775 (measuring

14

5/5 on all upper extremity strength tests, including bilateral wrist flexors), 804 (indicating "[n]egative facet maneuvers, [n]egative Lhermitte's exam, [and] [n]egative Spurling exam").)

Plaintiff failed to explain how the medical evidence shows no medical improvement and failed to reference specific records to support his argument. Plaintiff merely asserts that "[a]s shown by the medical evidence set forth fully above[,] there is no substantial change shown in Plaintiff's medical condition." (Doc. 17 at 18.) Plaintiff vaguely references in his brief that his complaints of chronic pain are the source of his disability, that no record of clinical improvement exists since the comparison point, and that no treating physician opines as to improvement. (*Id.*) As described in further detail above, however, the ALJ did not have to find a "substantial change" in order to determine that Plaintiff medically improved. Rather, the ALJ determines whether *any* decrease in the medical severity of Plaintiff's impairments occurred. 20 C.F.R. § 404.1594(b)(1).

Although Plaintiff argues that the ALJ arrived at the incorrect conclusion in analyzing the medical record after November 19, 2012, the Court is not permitted to re-weigh the evidence. *See, e.g., Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence.") (citations omitted); *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986) ("The weighing of evidence is a function of the [ALJ], not of the district

15

court."); *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984) (stating that when there is conflicting evidence on an issue, "it is the Secretary, acting through the ALJ, and not the court, who is charged with the duty to weigh the evidence and to determine the case accordingly") (citing *Richardson v. Perales*, 402 U.S. 389, 389-403 (1971)). The undersigned finds the ALJ's determination in this regard to be supported by substantial evidence.

Finally, Plaintiff argues in passing that Plaintiff "only needs to show that [he] cannot maintain full-time employment because [he] would be terminated from such employment. In this matter, pursuant to one of the treating physician's opinions, that would result even if [Plaintiff] was performing sedentary work because he would need to take a break every 45 minutes." (Doc. 17 at 19.) Plaintiff refers to the testimony of Dr. Gekht, who opined in part at his May 1, 2014 deposition that he would like Plaintiff "to be able to change positions if necessary every 45 minutes to an hour, [but] there are no other restrictions." (Tr. 848-49.) However, the ALJ specifically discussed Dr. Gekht's opined limitations and rejected them because the opinions relied heavily on Plaintiff's subjective report of symptoms, were conclusory, and were inconsistent with the record. (Tr. 35.) Plaintiff does not expressly challenge the ALJ's rejection in this regard or the ALJ's ultimate RFC finding on appeal. *See, e.g., Sanchez v. Comm' r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013) (noting that the claimant waived arguments, including that the ALJ failed to afford proper weight to medical

16

opinions, by not explicitly challenging the ALJ's findings).

Similarly, Plaintiff argues, in cursory fashion, that he would be disabled pursuant to Medical Vocational Guidelines Rule 201.14 because the definition of "skill" as set forth in Social Security Ruling 82-41 shows that, as a matter of law, Plaintiff has no transferable skills, contrary to vocational expert ("VE") testimony. (Doc. 17 at 20-21.) However, the ALJ determined that Plaintiff had the RFC to perform light work (as opposed to sedentary work) with restrictions (Tr. 29) and, therefore, properly relied on Rule 202.15 (as opposed to Rule 201.14) in determining whether Plaintiff has transferable skills that are transferable to other occupations with jobs existing in significant numbers in the national economy (Tr. 37). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 201.14; 202.15. Plaintiff did not expressly challenge the ALJ's RFC determination and, thus, Plaintiff's discussion of Rule 201.14 is irrelevant. *Sanchez*, 507 F. App'x at 856, n.1. Moreover, Plaintiff failed to explain how the definition of "skill" applies to render Plaintiff disabled or how the ALJ erred in relying on the VE's testimony that Plaintiff acquired transferable skills (knowledge of building products, estimating, and managing personnel) based on his past relevant work. Upon review of the record, the undersigned cannot find any error by the ALJ in that regard. (Tr. 65-68.)

## IV. Conclusion

The Court does not make independent factual determinations, re-weigh the

evidence, or substitute its decision for that of the ALJ. Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. Based on this standard of review, the undersigned recommends that the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act for the time period in question be affirmed.

Accordingly, it is respectfully **RECOMMENDED** that:

1. The Commissioner's decision be **AFFIRMED**.

2. The Clerk of Court be directed to enter judgment accordingly and close the file.

**DONE AND ENTERED** at Jacksonville, Florida, on August 14, 2017.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record